UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT HOFFMAN

     Plaintiff,

v.

STACEY NEVES & VICKIE
CARLSON

     Defendants.

_____/

Case No.: 17-13263

Robert H. Cleland
United States District Judge

Stephanie Dawkins Davis
United States Magistrate Judge

**REPORT AND RECOMMENDATION
DEFENDANT CARLSON'S MOTION
FOR SUMMARY JUDGMENT (Dkt. 12)**

## I.  PROCEDURAL HISTORY

Plaintiff brought this action *pro se* under 42 U.S.C. § 1983 on October 4,

2017.  (Dkt. 1).  District Judge Robert H. Cleland referred pretrial matters in this

case to the undersigned on October 12, 2017.  (Dkt. 5).  On January 8, 2018,

defendant Vickie Carlson filed her motion for summary judgment.  (Dkt. 12).

After an opportunity to conduct discovery (Dkt. 24, Order granting in part, denying

in part plaintiff's Rule 56(d) motion), plaintiff responded.  (Dkt. 28).

## II.  FACTUAL BACKGROUND

The following facts are undisputed.  Plaintiff was at all times relevant to this

case, an inmate at the G. Robert Cotton Correctional Facility (JCF).  He is now

incarcerated at the Lakeland Correctional Facility (LCF).  Defendant Vicki Carlson

is a registered nurse at JCF.  (Dkt. 12, at p. 1).  In the morning of October 10, 2015, at around 7:00 am, plaintiff was in the prison's healthcare unit getting examined by nurse Neves relating to complaints of severe abdominal pain. [1]  (Dkt. 28, Plaintiff's Declaration, at ¶ 4); (Dkt. 28, Request for Admission (RFA) nos. 1 and 2, Pg ID 172-73).  During the examination, plaintiff explained his history of pancreatitis, his two trips to healthcare the day before with abdominal pain, and his current severe abdominal pain.  (Dkt. 28, Pl.'s Dec., at ¶ 4).  Neves called plaintiff's medical provider, Dr. Rhodes, who ordered that plaintiff be taken to the hospital.  (Dkt. 28, Pl.'s Dec., at ¶ 5).  Carlson knew of Dr. Rhodes order.  (Dkt. 28, RFA no. 7, Pg ID 181).  However, after a dispute with Neves over plaintiff taking photos back to his cell before going to the hospital, plaintiff was not sent to the hospital, and he unwillingly left healthcare.  (Dkt. 28, Pl.'s Dec., at ¶ 6).  As he was walking out, Carlson told him, "Don't call us later when your [sic] in pain." (*Id.* at ¶ 7).

At around 12:45 pm, plaintiff went to his housing unit officer, "C/O Wieand," with complaints of severe abdominal pain.  The officer called healthcare

_____

[1] Carlson did not file a reply brief in which she could have disputed facts raised by plaintiff and not otherwise commented upon in her brief.  Therefore, the Court will assume that there is no dispute as to those facts.  *See Quinn's Auto. Inc. v. City of Parma*, 2007 WL 3232287, at *2, n. 2 (N.D. Ohio Oct. 31, 2007) ("As Plaintiffs have not challenged Defendants' use of the invoice, the court assumes that the parties do not dispute that this invoice is in fact for Michael J. Pavlick."); *Spotts v. United States*, 2007 WL 2137784, at *1, n. 1 (E.D. Ky. July 23, 2007) ("Since she did not dispute the defendant's recitation of facts, the Court assumes that Ms. Spotts believes that summary judgment is improper under those facts.").

and spoke with defendant nurse Carlson.  (Dkt. 12, Exhibit A – Carlson's Affidavit, at ¶ 5); (Dkt. 28, Pl.'s Dec., at ¶ 10).  The officer told Carlson that plaintiff was in severe abdominal pain, and that "he looks bad."  (Dkt. 28, Pl.'s Dec., at ¶ 10).  To this point, plaintiff provides fellow inmate, John Lee's affidavit, who stated that he was near plaintiff on October 9th and 10th, and could tell that plaintiff was moaning in pain and moving slowly, taking unsteady steps.  (Dkt. 28, Lee Affidavit, Pg ID 171).  Lee stated that it was clear to him that plaintiff was in severe pain.  (*Id.*).

Carlson took the complaint to Dr. Rhodes, and very shortly thereafter got back on the phone and told the officer that Dr. Rhodes said that plaintiff would have to wait until second shift, at 2:00 pm, to be seen in healthcare.  (*Id.*).  When Carlson took the call from the housing unit officer, she did not follow MDOC protocol or standing orders which state that when an inmate complains of severe abdominal pain, the nurse is to speak with or directly examine the inmate before taking the complaint to the medical provider.  (Dkt. 28, at P. 11; Dkt. 28, RFA nos. 5, 6, Pg ID 173; Dkt. 28, Interrogatory no. 10, Pg ID 180 (Carlson admits that she did not follow MDOC protocol or standing orders which required her to see plaintiff immediately for complaints of severe abdominal pain and assess him before reporting to the medical provider)); *see also* (Dkt. 28, MDOC Telephone Call and Kite Triage, Pg ID 166-67 and MDOC Standing Order 162-63 (severe

3

abdominal pain listed as highest priority complaint because this health issue, if not treated "expediently," could lead to much more serious outcomes)).  Carlson states she did not independently assess plaintiff because Dr. Rhodes was present and was consulted, Dr. Rhodes was plaintiff's medical provider, and plaintiff's complaint was the same as it had been that morning.  (Dkt. 28, Interrog. no. 5, Pg ID 176, Interrog. no. 7, Pg ID 179).  Carlson also stated that plaintiff could "possibly" have suffered complications from pancreatitis between 7:00 am and 12:45 pm when she took the call.  (Dkt. 28, Interrog. no. 14, Pg ID 185).

Plaintiff went back to his cell and waited to be called to healthcare.  (Dkt. 28, Pl.'s Dec., at ¶ 19).  He was afraid to move because when he did he would experience "severely painful abdominal muscle spasms."  (*Id.*).  Plaintiff eventually went back to the housing unit officer and had him call healthcare again; plaintiff was seen in healthcare around 3:20 pm.  (Dkt. 12, Ex. A, at ¶ 7).  Plaintiff was then sent to the hospital, where he remained for four days receiving treatment for pancreatitis.  (Dkt. 28, Pl.'s Dec., Pg ID 155).

The facts stated hereafter are in dispute.  According to plaintiff, when he was in healthcare the morning of October 10th explaining to Neves his history of pancreatitis and his complaints of severe abdominal pain, Carlson was within earshot, standing only 4-6 feet away from the conversation.  (Dkt. 28, Pl.'s Dec., Pg ID 152-53, ¶ 4).  Plaintiff states that he told both Neves and Carlson of his

history of pancreatitis and his current severe abdominal pain.  (*Id.*).  Plaintiff specifically states that he observed Carlson paying attention to the conversation he had with Neves and nodding her head as he explained his complaints.  (*Id.*).  In a request for admission that on the day in question Carlson was aware of plaintiff's history of pancreatitis, "as told to both Carlson and Neves that morning," Carlson responded that she was in healthcare that morning attending to her duties, which did not include plaintiff.  (Dkt. 28, RFA no. 2, Pg ID 173).  Carlson did not deny that plaintiff told both Carlson and Neves of his history.

According to Carlson, after being told of plaintiff's request during the 12:45 p.m. call, she went straight to Dr. Rhodes to inform her in person of the request. Dr. Rhodes told Carlson that plaintiff would have to wait until second shift to be seen in healthcare, and Carlson relayed the message.  (Dkt. 28, Interrog. no. 1, Pg ID 175; Dkt. 12, Ex. A, at ¶ 6).  Plaintiff contends that Dr. Rhodes gave Carlson no such order.  On October 16, during an examination with Dr. Rhodes, plaintiff asked her if, on October 10th, she told Carlson that he would need to wait until second shift.  Dr. Rhodes said she did not.  (Dkt. 28, Pl.'s Dec., Pg ID 155, ¶ 25). Fellow inmate Kenneth Peoples also provided a declaration.  Peoples stated that he was also in healthcare on the 16th, and that he was only 4-5 feet away from plaintiff and Dr. Rhodes.  Peoples overheard plaintiff ask Dr. Rhodes whether she

told Carlson not to treat him on October 10th.[2]  Dr. Rhodes said she did not.  (Dkt. 28, Peoples' Declaration, Pg ID 158).  Plaintiff also points out that there is no documentation of such an order from Dr. Rhodes, which he contends is suspicious considering that doctors' orders are supposed to be documented.  (Dkt. 28, at p. 12; Dkt. 28, Pl.'s Dec., ¶ 17).

According to plaintiff, Carlson did not tell anyone on second shift that plaintiff needed to be seen.  Carlson states that she gave a verbal report to second shift.  (Dkt. 28, Interrog. no. 11, Pg ID 184).  When plaintiff went back to healthcare around 3 pm that afternoon, Nurse Barker stated that Carlson did not tell her to call plaintiff on second shift.  (Dkt. 28, Pl.'s Dec., at ¶ 21).

## III.   ANALYSIS AND RECOMMENDATIONS

### A.   Standard of Review

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record...; or (B) showing that

---

[2] Peoples apparently heard plaintiff ask a different question than plaintiff himself reports.  This discrepancy does not render Peoples' declaration irrelevant.  Instead, People's declaration shows, at a minimum, that he understood the conversation plaintiff had with Dr. Rhodes to be that Carlson refused to treat plaintiff during her shift that day, i.e. before second shift.

the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1).  The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  Furthermore, the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'" *Brown v. Scott*, 329 F.Supp.2d 905, 910 (6th Cir. 2004). In order to fulfill this burden, the non-moving party need only demonstrate the minimal standard that a jury could ostensibly find in his favor. *Anderson*, 477 U.S.

at 248; *McLean v. 988011 Ontario*, *Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

However, mere allegations or denials in the non-movant's pleadings will not

satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving

party. *Anderson*, 477 U.S. at 248, 251.

The Court's role is limited to determining whether there is a genuine dispute

about a material fact, that is, if the evidence in the case "is such that a reasonable

jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Such a determination requires that the Court "view the evidence presented through

the prism of the substantive evidentiary burden" applicable to the case. *Id*. at 254.

Thus, if the plaintiff must ultimately prove its case at trial by a preponderance of

the evidence, on a motion for summary judgment the Court must determine

whether a jury could reasonably find that the plaintiff's factual contentions are true

by a preponderance of the evidence. *See id.* at 252-53. Finally, if the nonmoving

party fails to make a sufficient showing on an essential element of its case with

respect to which it has the burden of proof, the movant is entitled to summary

judgment. *Celotex*, 477 U.S. at 323. The Court must construe Rule 56 with due

regard not only for the rights of those "asserting claims and defenses that are

adequately based in fact to have those claims and defenses tried to a jury," but also

for the rights of those "opposing such claims and defenses to demonstrate in the

manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id*. at 327.

      B.    <u>Eighth Amendment</u>

      1.    Legal Standards

In the context of medical care, a prisoner's Eighth Amendment right to be free from cruel and unusual punishment is violated only when the prisoner can demonstrate a "deliberate indifference" to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104-06 (1976). "Where a prisoner has received some medical attention and the dispute is over the adequacy of treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976) (citations omitted). Moreover, mere negligence in identifying or treating a medical need does not rise to the level of a valid mistreatment claim under the Eighth Amendment. *Estelle*, 429 U.S. at 106. A viable Eighth Amendment claim has two components, one objective and the other subjective. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2002). A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

Under the objective component, "the plaintiff must allege that the medical need at issue is 'sufficiently serious.'" *Farmer*, 511 U.S. at 834.  Courts recognize that "[b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Hudson*, 503 U.S. at 8 (internal citations and quotation marks omitted).  Similarly, "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9.  A plaintiff can demonstrate that a medical need is sufficiently serious by showing that it is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Baynes v. Cleland*, 799 F. 3d 600 (6th Cir. 2005), quoting *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008); *See also*, *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004).

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *Farmer*, 511 U.S. at 834.  Deliberate indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very

purpose of causing harm or with knowledge that harm will result."[3]  *Id.*  To establish the subjective component, "the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded the risk."  *Id.* at 837.  In other words, this prong is satisfied when a prison official acts with criminal recklessness, i.e., when he or she "consciously disregard[s] a substantial risk of serious harm."  *Brooks v. Celeste*, 39 F.3d 125, 128 (6th Cir. 1994) (citing *Farmer*, 511 U.S. at 839-40).  "Basically, there must be a knowing failure or refusal to provide urgently needed medical care which causes a residual injury that could have been prevented with timely attention."  *Lewis v. Corr. Med. Servs.*, 2009 WL 799249, at *2 (E.D. Mich. Mar. 24, 2009).

---

[3] Defendant cites *Molton v. City of Cleveland*, 839 F.2d 240, 243 (6th Cir. 1988), for the proposition that to show deliberate indifference plaintiff must demonstrate treatment "tantamount to an intent to punish."  (Dkt. 12, at p. 4).  For the subjective component of deliberate indifference, the standard of "deliberateness tantamount to an intent to punish" is "not good law."  *Warren v. Prison Health Servs., Inc.*, 576 Fed.Appx. 545, 559 (6th Cir. 2014).  Instead, as set out above, "deliberate indifference ... is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."  *Farmer*, 114 S. Ct. at 1978.  *Farmer* described the boundary line, recklessness, as when "the official knows of and disregards an excessive risk to inmate ... safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk ... exists, and he must also draw the inference."  *Id.* at 1979.

2.      Discussion

Carlson argues that she is entitled to summary judgment because plaintiff failed to meet the standard for a constitutional violation for deliberate indifference, that plaintiff failed to show that she possessed a sufficiently culpable state of mind, and that he did not place verifying medical evidence in the record to establish that a delay in treatment had a detrimental effect on his health.  (Dkt. 12, at p. 7). Plaintiff argues that, when viewed in the light most favorable to him as non-movant, the facts demonstrate that Carlson acted with deliberate indifference in delaying medical treatment.  (Dkt. 28, at p. 7-8).

a.      "Sufficiently serious" medical need

A serious medical need generally falls into one of two categories: (1) a medical need diagnosed by a physician as requiring treatment; or (2) a medical need that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.  *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1988).  As to the latter category, "an inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed."  *Dodson v. Wilkinson*, 304 Fed. Appx. 434, 439 (6th Cir. 2008) (quoting *Napier v. Madison Cty., Ky.*, 238 F.3d 739, 742 (6th Cir. 2001).

As the Sixth Circuit in Blackmore explained, "*Napier* does not apply to medical care claims where facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 898 (6th Cir. 2004). Instead, "*Napier* applies where the plaintiff's 'deliberate indifference' claim is based on the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious. In such circumstances, medical proof is necessary to assess whether the delay caused a serious medical injury." *Id.* (citing *Napier,* 238 F.3d at 742).

In *Shadrick v. Hopkins Cty., Ky*., 805 F.3d 724, 737 (6th Cir. 2015), the Sixth Circuit determined that the objective prong was satisfied based on a physician's diagnosis mandating treatment. The plaintiff suffered from a number of different medical conditions demonstrating a "sufficiently serious" medical need for treatment and care. *Id.* (citation omitted). "Nearly all of his medical conditions had been diagnosed by his private physician as mandating treatment." *Id.* Further, the court noted plaintiff's need for medical care while confined at the prison was so obvious that even a lay person would easily recognize the necessity for a doctor's attention. Jones, 625 F.3d at 941 (citation omitted). "The deputy jailers could tell that [the plaintiff] needed prompt medical treatment even though they did not have the same medical training as SHP's nurses." *Id.* Similarly, in *Barner*

*v. Mackie*, 2017 WL 5633399, at *2 (6th Cir. Nov. 2, 2017), the court held that the plaintiff's complaint allegations were sufficient to satisfy the objective component of his deliberate indifference claim.  The plaintiff alleged that he had high blood pressure and medications to treat it.  *Id.*  The court stated that these facts could lead to the reasonable inference that a physician diagnosed the plaintiff as needing treatment for high blood pressure—a serious medical need.  *Id.*

Here, plaintiff can show that his pancreatitis, or severe abdominal pain, was a medical need that was "diagnosed by a physician as mandating treatment," thus establishing the objective component of his deliberate indifference claim.  Like in *Shadrick*, plaintiff's condition was diagnosed by a physician as mandating treatment.  Dr. Rhodes ordered that plaintiff be sent to the hospital for his complaints of severe abdominal pain the morning of October 10th.  (Dkt. 28, Pg ID 176, 181).  Since plaintiff has shown that his abdominal pain was "diagnosed by a physician as mandating treatment," the undersigned finds that he has satisfied the objective "serious medical need" component of his claim.  *See Gunther v. Castineta*, 561 Fed. Appx. 497, 501 (6th Cir. 2014).

Further, a reasonable jury arguably could conclude that plaintiff's condition posed an obvious need for medical attention that even a lay person could recognize.  Viewing the facts in the light most favorable to plaintiff, the housing unit manager told Carlson that plaintiff looked bad, and fellow inmate John Lee

could tell that plaintiff was in serious pain that day—both of whom presumably do not have the same medical training as health care personnel.  (Dkt. 28, Lee Affidavit, Pg ID 171).  Thus, both the housing unit manager and an inmate could tell that plaintiff was in severe abdominal pain warranting medical attention.

Having satisfied the objective component, plaintiff was not required to produce evidence of a detrimental effect of the delay in treatment under *Napier*, contrary to Carlson's contention.  In *Blackmore*, the plaintiff's claim fell under the "obviousness" standard, that is, the plaintiff's medical condition (appendicitis) was a medical need so obvious a lay person would readily recognize the necessity for a doctor's attention.  390 F.3d at 899.  The condition was not diagnosed by a physician as mandating treatment.  The *Napier* requirement of verifying medical evidence was not necessary to prove plaintiff had a sufficiently serious medical need in Blackmore's case.  Indeed, the Sixth Circuit was express:

> To the extent our previous opinions would benefit from clarification, we hold today that where a plaintiff's claims arise from an injury or illness 'so obvious that even a layperson could easily recognize the necessity for a doctor's attention,' (citation omitted), the plaintiff need not present verifying medical evidence to show that, even after receiving the delayed necessary treatment, his medical condition worsened or deteriorated.

*Id.* at 899-900.  The undersigned knows of no authority which states that where the objective prong is satisfied with a diagnosis mandating treatment the plaintiff still must come forward with verifying evidence of a detrimental

15

effect of the delay in treatment.  Thus, it would appear that because plaintiff has satisfied the objective component, no further proof from plaintiff is required.

> b.    Deliberate Indifference

As stated above, to be successful on a deliberate indifference claim the facts must demonstrate that the defendant subjectively perceived facts from which to infer substantial risk to the prisoner, that she did in fact draw the inference, and that she then disregarded the risk.

Plaintiff has presented sufficient facts, when viewed in a light most favorable to him, to establish that a reasonable jury could conclude that Carlson subjectively perceived facts from which she could infer a substantial risk to plaintiff.  At a minimum, she knew that plaintiff's complaint at 12:45 pm was the same complaint he made earlier in the morning to nurse Neves.  She knew that, based on that complaint, plaintiff was ordered to be taken to the hospital earlier that day.  And, she also knew that plaintiff had a history of pancreatitis.  Further, during his morning examination with nurse Neves, Carlson was within earshot and was listening to plaintiff's complaints of severe abdominal pain and history of pancreatitis.  There is sufficient evidence for a jury to find that Carlson subjectively perceived facts from which she could infer a substantial risk to plaintiff.  *See e.g.*, *Brookes v. Shank*, 660 Fed. Appx. 465, 468 (6th Cir. 2016)

(finding doctor subjectively perceived facts from which he could infer a substantial risk to the plaintiff where he knew that the plaintiff had been diagnosed with peripheral neuropathy).

A reasonable jury could also conclude that Carlson in fact drew the inference of substantial risk to plaintiff.  Plaintiff argues that Carlson drew the inference of substantial risk and acted with deliberate indifference because she did not follow MDOC policies and standing orders which require, among other things, that the nurse immediately evaluate an inmate's complaint of severe abdominal pain and that she assess the inmate's complaint before reporting the condition to the medical provider.  (Dkt. 28, at P. 11; Dkt. 28, discovery responses, Pg ID 180); *see also* (Dkt. 28, MDOC Telephone Call and Kite Triage, Pg ID 166-67 and MDOC Standing Order 162-63).  Although failure to follow a standing medical order can be considered in determining whether the defendant has shown deliberate indifference, *Harris v. City of Circleville*, 583 F.3d 356, 369 (6th Cir. 2009) (considering defendant officers' failure to follow an explicit jail policy requiring "all persons involved in use of force incidents who complain of or perceive injuries" to receive medical attention as soon as possible to be circumstantial evidence of deliberate indifference), the "failure to follow administrative policies alone does not itself constitute deliberate indifference."  *Bonner-Turner v. City of Ecorse*, 627 Fed. Appx. 400, 407 (6th Cir. 2015).  For example, in *Ward v. Corizon*

*Health, Inc.*, the court held that a nurse's failure to refer an inmate to a medical provider in accordance with a standing order that required such a referral based upon an inmate's neurologic symptoms did not constitute a constitutional violation because the plaintiff had not "provided any evidence to suggest that [failure to follow a standing order] amount[ed] to more than mere negligence." 2016 WL 4224973, at *6 (E.D. Mich. July 12, 2016); *Bradford v. Owens*, 2016 WL 7015662, at *12 (W.D. Ky. Nov. 29, 2016) (discussing the same).

Here, Carlson's failure to follow prison policy or standing orders would appear to carry some probative weight because it does not stand alone. A reasonable jury could conclude that Carlson in fact inferred a serious risk to plaintiff. She knew the facts surrounding his medical care the morning of October 10th, and she took plaintiff's 12:45 pm complaint straight to Dr. Rhodes, rather than taking the time to assess him herself in accordance with policy. This indicates that Carlson drew the inference that there was a substantial risk of harm to plaintiff based on his complaint of severe abdominal pain. Even setting aside Carlson's failure to follow procedures, a reasonably jury could conclude that Carlson taking the complaint straight to Dr. Rhodes, knowing Dr. Rhodes had earlier ordered plaintiff to be taken to the hospital for the same complaints, indicates that she inferred serious risk to plaintiff.

The question whether Carlson disregarded the risk involves a dispute of material fact.  Carlson argues that she is not liable because she was merely following Dr. Rhodes' order that plaintiff had to wait until second shift.  Plaintiff, on the other hand, disputes whether Dr. Rhodes gave such an order.  And, neither party has produced a statement from Dr. Rhodes.  Whether Dr. Rhodes gave this order is material because if Dr. Rhodes told Carlson plaintiff would have to wait, and Carlson was merely relaying Dr. Rhodes' order, then Carlson may not have been deliberately indifferent to plaintiff's medical needs.  At least one Circuit court has considered whether following a doctor's orders shields a nurse from liability; the Seventh Circuit has stated, "Nurses may generally defer to instructions given by physicians, but that deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient."  *Holloway v. Delaware Cnty. Sheriff,* 700 F.3d 1063, 1075 (7th Cir. 2012) (internal quotation omitted).  In *Hamilton v. Pike Cty., Ky.*, 2013 WL 529936, at *12 (E.D. Ky. Feb. 11, 2013), the prisoner plaintiff had been complaining about weakness and problems walking, and sometimes an inability to walk.  The plaintiff brought a deliberate indifference claim against various personnel, including Nurse Ray. Nurse Ray was aware of a serious medical risk: plaintiff's inability to walk.  *Id.* "Nurse Ray responded to that risk by calling Dr. Waldridge, who did not order her to take further action beyond providing [plaintiff] with a multivitamin.  Nurse

Ray's deference to Dr. Waldridge's course of treatment was not deliberate indifference." *Id.* (citing *Holloway*, 700 F.3d at 1075). Nurse Ray's explanation for why she followed the doctor's order was that she knew that Dr. Waldridge had seen the plaintiff in person the day before her call with Dr. Walbridge about the plaintiff. Further, Nurse Ray was not licensed to independently diagnose conditions, devise treatment plans, or prescribe medication. *Id.* Therefore, the Nurse's failure to check on the plaintiff after giving him the multivitamin did not support the plaintiff's deliberate indifference claim.

Similarly, here Carlson responded to plaintiff's 12:45 pm complaint by taking the complaint to Dr. Rhodes. Carlson was aware that earlier that day Dr. Rhodes had ordered plaintiff to be taken to the hospital for his complaints. As Carlson stated, she did not have the authority to override Dr. Rhodes' orders. (Dkt. 21, Ex. A, ¶ 8). Assuming Carlson consulted with the very medical provider who had ordered plaintiff sent to the hospital earlier that day, and that Carlson lacked the authority to alter the course of treatment, Carlson's relay of the message does not support a deliberate indifference claim.

On the other hand, if Carlson was not acting under the direction of Dr. Rhodes in relaying the message, then a reasonable jury could conclude that she was deliberately indifferent to plaintiff's needs. As stated, she was aware he was ordered to be sent to the hospital earlier that day for same complaints he raised at

12:45 pm, she was aware of his history of pancreatitis, she was aware (presumably) that he did not go to the hospital that morning, and she was aware that plaintiff could "possibly" suffer complications from pancreatitis between 7:00 am and 12:45 pm. Carlson also disregarded MDOC policy and standing orders which require nurses to assess the inmate before taking the complaint to the medical provider. (Dkt. 28, Pg ID 173, 176, 180). Additionally, Carlson did not inform anyone on second shift that plaintiff needed to be seen. Include among these facts that Carlson told plaintiff that morning not to call healthcare later with complaints after he was made to leave healthcare. Taken the in the light most favorable to plaintiff, a reasonable jury could conclude that Carlson deliberately disregarded the risk to plaintiff by making plaintiff wait until second shift to go to healthcare. Therefore, there is a dispute of material fact on the subjective component of plaintiff's deliberate indifference claim.

     C.    <u>Qualified Immunity</u>

The doctrine of qualified immunity means that "'[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Caldwell v. Moore*, 968 F.2d 595, 599 (6th Cir. 1992) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Defendants bear the burden of pleading qualified

immunity, but plaintiff bears the burden of showing that the defendant's conduct

violated a right so clearly established that a reasonable official in his or her

position would have clearly understood that he or she was under an affirmative

duty to refrain from such conduct.  *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir.

2002) (citation omitted) (explaining that "[t]he ultimate burden of proof is on the

plaintiff to show that the defendant is not entitled to qualified immunity").

The Supreme Court has established a two-part test in order to determine

whether qualified immunity is applicable to a particular situation.  *Saucier v. Katz*,

533 U.S. 194, 201 (2001).  The first part of the test involves a determination of

whether the facts of the case, viewed in the light most favorable to the plaintiff,

"show the officer's conduct violated a constitutional right."  *Id*.  If the first

question was resolved in the affirmative, then the court would decide "whether the

right was clearly established."  *Id*.  If both questions are resolved in the affirmative,

then the doctrine of qualified immunity would not apply and the case could

proceed.  Conversely, if the answer to either question is no, then qualified

immunity obtains.  The court may consider the questions in whichever order the

court concludes makes the most sense.  *Pearson v. Callahan*, 555 U.S. 223, 227

(2009).  "When a defendant invokes qualified immunity in a motion for summary

judgment, the plaintiff must offer sufficient evidence to create a genuine dispute of

fact that the defendant violated a clearly established right."  *Folks v. Petit*, 676 Fed.

Appx. 567, 569 (6th Cir. 2017) (citing *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 608–09 (6th Cir. 2015)).

Carlson argues that she is entitled to qualified immunity because she did not violate clearly established law.  (Dkt. 12, at p. 9)  However, plaintiff has demonstrated that there is an issue of fact as to whether Carlson acted with deliberate indifference in violation of the Eighth Amendment, as discussed above. There is some authority which states that questions of qualified immunity should not be left to a jury; rather, "the court—not the jury—must consider the 'threshold question" of whether "the facts alleged show the officer's conduct violated a constitutional right.'"  *Phillips v. Roane Cty., Tenn.*, 534 F.3d 531, 539 (6th Cir. 2008) (quoting *Saucier v. Katz,* 533 U.S. 194, 201 (2001)).  In that case, taking all the facts in the light most favorable to plaintiff, there is evidence demonstrating a constitutional violation.  As discussed above, Carlson subjectively perceived facts from which to infer a serious risk to plaintiff, and she did in fact draw the inference.  Further, Carlson disregarded the risk by deciding that plaintiff could not be seen until second shift and by not informing second shift of plaintiff's serious complaint of pain after telling him not to call healthcare with complaints. Therefore, plaintiff has provided evidence which shows that Carlson violated a constitutional right.

Carlson does not argue that plaintiff's right to be free form cruel and unusual punishment by way of delay in medical treatment for a serious medical need is not clearly established. The right was clearly established in 1976, and at the time of the alleged offense. "Elementary principles concerning the Eighth Amendment's proscription of cruel and unusual punishment establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Taylor v. Malatinsky*, 2010 WL 4608711, at *6 (E.D. Mich. Sept. 30, 2010), *report and recommendation adopted*, 2010 WL 4608695 (E.D. Mich. Nov. 4, 2010) (citing *Estelle v. Gamble,* 429 U.S. 97, 102-103 (1976)); *see also Napier*, 238 F.3d at 742-43; *Blackmore*, 390 F.3d at 899.

Therefore, the undersigned suggests that Carlson is not entitled to qualified immunity.

## IV. RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that defendant Carlson's motion for summary judgment (Dkt. 12) be **DENIED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and*

*Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some

issues but fail to raise others with specificity will not preserve all the objections a

party might have to this Report and Recommendation.  *Willis v. Sec'y of Health*

*and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

*Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule

72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2,"

etc.  Any objection must recite precisely the provision of this Report and

Recommendation to which it pertains.  Not later than 14 days after service of an

objection, the opposing party may file a concise response proportionate to the

objections in length and complexity.  Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d).

The response must specifically address each issue raised in the objections, in the

same order, and labeled as "Response to Objection No. 1," "Response to Objection

No. 2," etc.  If the Court determines that any objections are without merit, it may

rule without awaiting the response.

 Date:  August 14, 2018                    s/Stephanie Dawkins Davis
                                           Stephanie Dawkins Davis
                                           United States Magistrate Judge

## **CERTIFICATE OF SERVICE**

I certify that on August 14, 2018, I electronically field the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to all counsel of record and that I have mailed by United States Postal Service to the following non-ECF participant: <u>Robert Hoffman #181813, Lakeland Correctional Facility, 141 First Street, Coldwater, MI 49036.</u>

<u>s/Tammy Hallwood</u>
Case Manager
(810) 341-7887
tammy_hallwood@mied.uscourts.gov