UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT HOFFMAN

      Plaintiff,

v.

STACEY NEVES & VICKIE
CARLSON

      Defendants.

_____/

Case No.: 17-13263

Terrence G. Berg
United States District Judge

Michael J. Hluchaniuk
United States Magistrate Judge

**REPORT AND RECOMMENDATION:**
**DEFENDANT NEVES' MOTION**
**FOR SUMMARY JUDGMENT (ECF No. 84)**

## I.   PROCEDURAL HISTORY

Plaintiff brought this prisoner civil rights action under 42 U.S.C. § 1983 on October 4, 2017.  (ECF No. 1).  District Judge Terrence G. Berg referred pretrial matters in this case to the undersigned on December 30, 2019, after the case was reassigned.  (ECF No. 94).  On January 8, 2018, defendant Vickie Carlson filed her motion for summary judgment.  (ECF No. 12).  The Court adopted the August 2018 recommendation to deny Carlson's dispositive motion.  (ECF Nos. 38, 46).  On August 6, 2019, defendants Neves and Carlson filed a joint motion for summary judgment.  (ECF No. 84).  The Court struck Carlson's motion because she did not seek leave to file a second motion for summary judgment under local rule 7.1(b)(2).  (ECF No. 87, 93).  Accordingly, this report and recommendation

discusses only defendant Neves' motion for summary judgment.  Hoffman

responded to the motion, and Neves replied.  (ECF No. 86, 89).  After the matter

was set for hearing, the parties requested that the motion be decided without oral

argument.  (*See* Text-Only Notice dated 10/15/19).  In the parties' joint statement

of resolved issues, the parties agreed that Hoffman does not have a compensable

Fourteenth Amendment claim and that any claims against the defendants in their

official capacities are barred by Eleventh Amendment immunity.  (ECF No. 92).

For the reasons stated more fully below, the undersigned **RECOMMENDS**

that Neves' motion for summary judgment be **GRANTED**.

## II.    FACTUAL BACKGROUND

At all times relevant to the events in this case, Hoffman was a prisoner at

Gus Harrison Correctional Facility (JCF) and defendants Neves and Carlson[1] were

nurses at JCF.  (ECF No. 86-2, PageID.688 – Hoffman's Deposition Transcript).

Between February 2015 and October 9, 2015, Hoffman was diagnosed with

chronic pancreatitis and he experienced flare-ups of pancreatitis for which he was

hospitalized at different times during that period.  (ECF No. 86-2, PageID.711).

He also had four surgeries on his stomach/pancreas between May and September

2015.  (ECF No. 8602, PageID.732).  On the evening of October 9, 2015, he

---

[1] Though Carlson is not a party to the motion for summary judgment at bar, discussion of her involvement in the events is necessary.

presented to healthcare with complaints of abdominal pain.  He was given Tylenol with codeine and sent back to his cell.  (ECF No. 86-2, PageID.724-25).

The next day, at around 7 in the morning, Hoffman went back to healthcare where Neves evaluated him.  (ECF No. 86-2, PageID.691).  Because there was no doctor on site at that time, she called the on-call doctor, non-party Dr. Rhodes and relayed Hoffman's complaints.  Dr. Rhodes told Neves to send Hoffman to the hospital.  (ECF No. 86-2, PageID.695-97).  Carlson was present during the evaluation.  (ECF No. 86-2, PageID.745; ECF No. 86-5, PageID.903-04).

Although Dr. Rhodes ordered that he be sent to the hospital, Hoffman did not go to the hospital.  When he presented to healthcare that morning, he brought with him images of his pancreas taken earlier that year.  These images showed evidence of necrotizing pancreatitis.  Neves told him he would have to leave the images in healthcare before going to the hospital.  He refused to do so.  On a prior occasion, Hoffman left personal property in healthcare before going to the hospital, and he never got that property back.  He did not want to lose these images as they were the only copies he had.  He told Neves he wanted to take them back to his cell before going to the hospital.  Neves told him he could not do that.  (ECF No. 86-2, PageID.697-98).

Neves then called a sergeant "to try to get him . . . to leave so he could take his belongings so he would be able to go" to the hospital.  (ECF No. 86-3,

PageID.802).    Non-party Sergeant Moss arrived.  He told Hoffman he could not go back to his cell before going to the hospital.  He offered to take the images to Hoffman's cell himself or to have his cellmate pick up the images in healthcare and take them their cell.  (ECF No. 84-9, PageID.644, ¶ 8-9; ECF No. 86-5, PageID.905).  Hoffman refused these options.  He wanted to personally take the images to his cell and lock them in his lock box before going to the hospital. Because he refused to leave the images, he was sent back to his cell and did not go to the hospital that morning.  (ECF No. 84-9, pageID.944, ¶ 10; ECF No. 86-3, PageID.784).

In an affidavit, the sergeant explained that it was common practice at JCF to prevent an inmate from going to their cell once the decision is made to take the inmate out of the prison.  This is for security reasons.  He says there is a risk that the prisoner, if allowed to go back to their cell before leaving, could get information to someone outside the prison about when the prisoner would be leaving.  That person could then attempt to help the prisoner escape or cause other safety and security issues.  (ECF No. 84-9, PageID.643, ¶ 6).  Neves understood there to be a policy that prisoners cannot take personal property with them to the hospital, so they must leave their property in healthcare.  (ECF No. 86-3, PageID.784).  Since Hoffman refused to leave his images, he was considered to

have refused the hospital visit and was sent back to his cell.  (ECF No. 86-3, PageID.784).

Hoffman questions whether such a policy or common practice exists because defendants did not produce a written policy.  He believes Neves and Sergeant Moss fabricated the common practice of keeping inmates from moving about the prison before being taken out of the prison.

After he left healthcare that morning, Hoffman continued to be in severe pain and started having muscle spasms in his abdomen anytime he moved.  (ECF No. 86-2, PageID.709).  Around 12:45 p.m. he approached his unit officer and asked to be sent to healthcare so he could go to the hospital.  The unit officer, Wieand, spoke on the phone with Carlson and explained that Hoffman was in pain.  (ECF No. 86-2, PageID.709).  According to Carlson, she took this complaint to Dr. Rhodes in person, as Dr. Rhodes was now in the prison.  Neves said she went with Carlson to talk to Dr. Rhodes at that time.  (ECF No. 86-3, PageID.791-92; ECF No. 86-5, PageID.910).  Dr. Rhodes told Carlson that they "messed with him enough this morning," and that he would have to wait until second shift to go to healthcare.  (ECF No. 86-5, PageID.917).  Neves says there was no medical or security reason to make him wait until second shift, and that making him wait was "nasty treatment."  (ECF No. 86-3, PageID.811, 819).  Second shift started at 2:30.  (ECF No. 86-5, PageID.925).  At around 3:20 that afternoon, Hoffman went back

to his unit officer.  He again complained of severe abdominal pain.  The officer called healthcare and spoke to a nurse Spencer.  At 3:30, Hoffman was called to healthcare.  He was then sent to the hospital where he remained for four days being treated for pancreatitis.

Dr. Rhodes remembers ordering that Hoffman be sent to the hospital the morning of October 10, 2015.  Though she initially did not recall physically being present at the prison later on October 10, 2015, time records reviewed at her deposition refreshed her memory that she was there from 11:05 until 3:10 doing paperwork.  (ECF No. 86-4, PageID.857-58, 861).  Despite her presence, Dr. Rhodes insists that she did not speak to Carlson and Neves around 12:45 p.m. that day (or anytime that afternoon), either in person or on the phone.  (ECF No. 86-4, PageID.849-50, 852, 855).  If a nurse had come to her with a question about a patient that day, she says she would have instructed the nurse to call the on-call doctor because she was not at the facility to provide care.  (ECF No. 86-4, PageID.858-59, 861).  She also insists she did not give the order that Hoffman would have to wait until second shift to go to healthcare, either in person or on the phone.  (ECF No. 86-4, PageID.851-52).  As for the reason why Hoffman was not sent to the hospital in the morning, Dr. Rhodes said that if a nurse had a question about whether an inmate was allowed to go back to their cell, that would be entirely a custody concern.  (ECF No. 86-4, PageID.880-81).

III.   **ANALYSIS AND RECOMMENDATIONS**

A.   <u>Standard of Review</u>

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record...; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed.R.Civ.P. 56(c)(1).  The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  Furthermore, the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for

trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). That is, the party

opposing a motion for summary judgment must make an affirmative showing with

proper evidence and must "designate specific facts in affidavits, depositions, or

other factual material showing 'evidence on which the jury could reasonably find

for the plaintiff.'" *Brown v. Scott*, 329 F.Supp.2d 905, 910 (6th Cir. 2004).

In order to fulfill this burden, the non-moving party need only demonstrate the

minimal standard that a jury could ostensibly find in his favor. *Anderson*, 477 U.S.

at 248; *McLean v. 988011 Ontario*, *Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

However, mere allegations or denials in the non-movant's pleadings will not

satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving

party. *Anderson*, 477 U.S. at 248, 251.

The Court's role is limited to determining whether there is a genuine dispute

about a material fact, that is, if the evidence in the case "is such that a reasonable

jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Such a determination requires that the Court "view the evidence presented through

the prism of the substantive evidentiary burden" applicable to the case. *Id*. at 254.

Thus, if the plaintiff must ultimately prove its case at trial by a preponderance of

the evidence, on a motion for summary judgment the Court must determine

whether a jury could reasonably find that the plaintiff's factual contentions are true

by a preponderance of the evidence. *See id.* at 252-53. Finally, if the nonmoving

party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the movant is entitled to summary judgment. *Celotex*, 477 U.S. at 323. The Court must construe Rule 56 with due regard not only for the rights of those "asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury," but also for the rights of those "opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id*. at 327.

Hoffman – analysis section

    B.    Discussion

Hoffman argues that the denial of a hospital visit, both around 7:30 a.m. and 12:45 p.m., constitutes deliberate indifference to his serious medical needs in violation of the Eighth Amendment. In the context of medical care, a prisoner's Eighth Amendment right to be free from cruel and unusual punishment is violated only when the prisoner can demonstrate a "deliberate indifference" to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104-06 (1976). A viable Eighth Amendment claim has two components, one objective and the other subjective. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2002). A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to

establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

Hoffman has not demonstrated that Neves' conduct on October 10, 2015, satisfied the subjective component of his claim, as explained below.[2]  The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *Farmer*, 511 U.S. at 834.  Deliberate indifference "entails something more than mere negligence," *id*. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.*  To establish the subjective component, "the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded the risk." *Id.* at 837.  In other words, this prong is satisfied when a prison official acts with criminal recklessness, i.e., when he or she "consciously disregard[s] a substantial risk of serious harm." *Brooks v. Celeste*, 39 F.3d 125, 128 (6th Cir. 1994) (citing *Farmer*, 511 U.S. at 839-40).

---

[2] For the reasons stated in the report and recommendation dated August 14, 2018, the objective component is likely satisfied.  Hoffman's claim is that he was denied needed and physician-ordered medical care, not that the care he received was inadequate.  Since Dr. Rhodes diagnosed Hoffman's condition as requiring treatment (a visit to the hospital), Hoffman has likely demonstrated that he had a sufficiently serious medical need. *See Baynes v. Cleland*, 799 F. 3d 600 (6th Cir. 2005).  However, the undersigned need not fully address the objective component because the claim fails on the subjective component, as discussed herein.

To be sure, a reasonable jury could conclude that Neves was aware of facts from which to infer a risk of harm; namely, Dr. Rhodes told her to send him to the hospital for his complaints of abdominal pain.  A reasonable jury could also find that Neves drew the inference, as she began making preparations to send him out— she told Hoffman he was going to the hospital and began to prepare him to go by telling him he would need to leave his personal property there in healthcare before leaving.  But this is not enough for a deliberate indifference claim.  It must also be the case that Neves was deliberately indifferent to, or acted with conscious disregard for, Hoffman's medical needs.

> 1.   Morning Claim

The evidence demonstrates that Hoffman did not go to the hospital around 7:30 a.m. because of his refusal to leave the images—his property—in healthcare or to allow someone else to take them back to his cell.  It was not Neves' deliberate indifference to his medical needs that kept him at the prison.  Neves provided evidence, by way of her sworn testimony, of a prison policy that prohibited an inmate from taking personal property to the hospital.  She also provided Sergeant Moss's affidavit testimony of a common practice at JCF to prohibit an inmate from moving about the prison after the decision is made to take the inmate out of the prison, for security reasons.  Hoffman refused to obey the prison policies.

11

Hoffman challenges the existence of these policies because Neves did not produce a written copy of either the policy or common practice.  Because there is no written policy in evidence, Hoffman suggests that Neves and Moss fabricated the policy and common practice in order to keep Hoffman from going to the hospital that morning.  (ECF No. 86, PageID.672-73).  He provided no evidence to support his theory.

Hoffman's mere speculation that the policies were fabricated is insufficient to rebut the evidence that such a policy and common practice existed at the prison. The Sixth Circuit has previously rejected the proposition that speculation can substitute for evidence, explaining, "[t]o survive a summary judgment motion, a plaintiff must put forward more than speculations or intuitions." *Frazier v. USF Holland, Inc.*, 250 Fed. Appx. 142, 148 (6th Cir. 2007) (citing *Mulhall v. Ashcroft,* 287 F.3d 543, 552 (6th Cir. 2002) (holding that plaintiff failed to establish knowledge on the part of the decisionmaker where plaintiff did not produce any evidence, direct or circumstantial, to rebut evidence that decisionmaker had no knowledge and plaintiff offered "only conspiratorial theories, not the specific facts required under the Federal Rule of Civil Procedure 56").  It is true that Neves did not produce a written version of the policy against taking property to the hospital or the "common practice" discussed here.  It is possible that the policy and common practice were not reduced to writing.  But,

Hoffman has cited no authority that suggests that a prison policy or practice is illegitimate, or cannot be considered on summary judgment, unless it is in writing.[3] Hoffman has brought forth no evidence to rebut the sworn testimony on the existence of the policy and common practice.  While reasonable inferences are to be drawn in Hoffman's favor, *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000), to infer that the policies were fabricated because Neves did not provide a written policy is not a reasonable inference.

Thus, the evidence before the Court shows that Neves was following prison policy and custody practice when she did not allow Hoffman to take his images to the hospital or to his cell that morning before going to the hospital.  A prison's security policies and practices are due a degree of deference.  The Supreme Court has held that, "a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators."  *Rhodes v. Chapman,* 452 U.S. 337, 349 n. 14 (1981).  "Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional

---

[3] It is noteworthy that on a prior occasion, Hoffman left his personal property in healthcare before being sent to the hospital.  He does not say whether he left his property because he was told to do so under the purported policy, but this would seem to be the likely reason why he would have done so.  It is also noteworthy and Hoffman's statement that he thought he would lose the images if he left them in healthcare is speculative, even though he lost property on a prior occasion.  There is no evidence before the Court to suggest that property left in healthcare is thrown away or is never returned to the inmate.

security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979). Such deference does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that the Court not "freely substitute [its] judgment for that of officials who have made a considered choice." *Whitley v. Albers,* 475 U.S. 312, 322 (1986).  The policies appear to be reasonable and tailored to the goal of maintaining security and custody.  And, there is no evidence that suggests that Neves' adhered to the policies in bad faith or for no legitimate purpose.

The fact that Hoffman did not want to leave his images in healthcare or allow someone else to take them back does not demonstrate that Neves was deliberately indifferent to his medical needs.  In effect, Hoffman made the choice not to go to the hospital.  Prison officials are not deliberately indifferent to a prisoner's serious medical needs when the prisoner refuses to accept medical treatment or when his disruptive behavior thwarts treatment.  *See, e.g., Richard v. Bokor*, 379 Fed. Appx. 719, 722 (10th Cir. 2010); *Pinkston v. Madry*, 440 F.3d 879, 892 (7th Cir. 2006); *see also Ziegler v. McGinnis*, 32 Fed. App'x 697, 698–99 (6th Cir. 2002) ("Ziegler also alleged that the defendants denied him medical care by requiring him to pay a $3.00 co-payment. He did not claim, however, that he could not afford the $3.00. Thus, he was denied care not because of the defendants' deliberate indifference but because of his own refusal to pay.").

Perhaps he would have preferred that Neves somehow overridden prison security policy or practice, but her failure to do so does not equate to a conscious disregard for his medical needs.  It was Hoffman's decision, or refusal to comply with prison practices, that lead to his return to his unit rather than going to the hospital that morning.

### 2.   Afternoon Claim

Neves' conduct the afternoon of October 10, 2015, around 12:45 p.m. likewise does not amount to deliberate indifference.  According to Neves, when Hoffman's unit manager called to healthcare and spoke to Carlson around 12:45 that day, both she and Carlson went to Dr. Rhodes' office to speak to her in person.[4]  Both defendants say that Dr. Rhodes instructed Carlson that Hoffman would have to wait until second shift to go back to healthcare.  Neves did not know of any reason why Hoffman should have been made to wait until second shift. Both Hoffman and Dr. Rhodes dispute that this conversation ever took place and they both insist that Dr. Rhodes did not give the order that Hoffman would have to wait until second shift.

Hoffman argues that, assuming Dr. Rhodes did give this order, then Neves was deliberately indifferent to his medical needs because she had a duty to provide

---

[4] Neves did not remember the exact time she saw Dr. Rhodes that afternoon with Carlson (ECF No. 86-3, PageID.795), but since this is the call where Hoffman was told he would have to wait, this is the only time Neves could be speaking of.

necessary services in a timely manner, despite Dr. Rhodes' order that he would have to wait.  (ECF No. 86, PageID.674).  He also asserts that if Dr. Rhodes said they had "messed with him enough that morning," as Carlson says, then Neves knew that Dr. Rhodes was only "messing" with his healthcare.  Hoffman cites *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1075 (7th Cir. 2012), for the proposition that a nurse cannot hide behind a doctor's order if it is apparent that the doctor's order "will likely harm the patient."  It bears repeating that Hoffman's arguments here are premised on the assumption that Dr. Rhodes said these things that afternoon, even though it is his position that Dr. Rhodes did not give any such order or say anything at all to Carlson and Neves that afternoon.

Assuming Neves and Carlson spoke to Dr. Rhodes that afternoon and Dr. Rhodes said they "messed" with him enough already and that he had to wait, liability should still not attach to Neves.  The issue of a nurse's deference to a physician's order was addressed in the earlier report and recommendation on Carlson's motion for summary judgment.  Therein, the Court observed the following.  "Nurses may generally defer to instructions given by physicians, but that deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient."  *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1075 (7th Cir. 2012) (internal quotation omitted).  In *Hamilton v. Pike Cty., Ky.*, 2013 WL 529936, at *12 (E.D. Ky. Feb. 11, 2013), the

prisoner plaintiff had been complaining about weakness and problems walking, and sometimes an inability to walk, among other problems.  The plaintiff brought a deliberate indifference claim against various personnel, including Nurse Ray. Nurse Ray was aware of a serious medical risk: plaintiff's inability to walk.  *Id.* "Nurse Ray responded to that risk by calling Dr. Waldridge, who did not order her to take further action beyond providing [plaintiff] with a multivitamin.  Nurse Ray's deference to Dr. Waldridge's course of treatment was not deliberate indifference."  *Id.* (citing *Holloway*, 700 F.3d at 1075).  The next morning, the plaintiff was sent to the hospital unresponsive and not breathing.  *Id.* at 3.  Nurse Ray's explanation for why she followed the doctor's order to only give him a multivitamin was that she knew that Dr. Waldridge had seen the plaintiff in person the day before her call with Dr. Walbridge about the plaintiff.  Further, Nurse Ray was not licensed to independently diagnose conditions, devise treatment plans, or prescribe medication.  *Id.* at *12.  Therefore, the Nurse's failure to check on the plaintiff after giving him the multivitamin did not support the plaintiff's deliberate indifference claim.  (*See* ECF No. 38, PageID.288-29).

Here, Neves' inaction at 12:45 p.m. does not subject her to liability.  Neves was aware that Dr. Rhodes had ordered Hoffman to be sent to the hospital earlier that day for the same complaints he had that afternoon, but that Hoffman did not go because of the issue with the images he brought to healthcare.  Neves and

Carlson were, that afternoon, consulting with the same medical provider who gave the order to go to the hospital, and that medical provider told them to wait.  And, Neves did not have authority to send Hoffman to the hospital.  (ECF No. 86-4, PageID.872-73).  Dr. Rhodes testified that nurses had the authority to send a prisoner to the hospital without a doctor's order only in an emergency situation, such as a heart attack.  Dr. Rhodes said Hoffman's condition was not such an emergency situation.  So, like Nurse Ray in *Hamilton*, *supra*, Neves' failure to stand up to Dr. Rhodes or to go around Dr. Rhodes and send Hoffman to the hospital does not support a deliberate indifference claim.[5]

And, it is noteworthy that it was Carlson who was apparently handling the medical issue in the afternoon, not Neves.  Carlson received the phone call and Dr. Rhodes allegedly told her that Hoffman would have to wait.  It seems as though Neves' only participation that afternoon was to be present during the conversation between Carlson and Dr. Rhodes, if there was a conversation.  It does not appear that she played any part in ordering that Hoffman wait.  *See Copeland v. Machulis*, 57 F.3d 476, 481 (6th Cir. 1995) (Liability under the federal civil rights laws must be premised on an individual's personal involvement in the violation of a

---

[5] Notably, Hoffman does not suggest what Neves should have (or could have) done after hearing Dr. Rhodes' order to wait until second shift.  For example, he does not suggest, as stated above, that Neves should have sent him to the hospital of her own accord, or that she should have taken Hoffman's complaint to some other official.  He argues only that Neves had a duty to provide care.

plaintiff's constitutional rights.) (citing *Rizzo v. Goode*, 423 U.S. 362, 375–76 (1976)).  Since Carlson answered the call from Hoffman's unit manager, and Dr. Rhodes gave Carlson the order to tell the unit manager, it is not clear why Neves would have had a duty to act on Hoffman's complaint that afternoon.

If there was no conversation with Dr. Rhodes that afternoon at all, as Hoffman believes, and Dr. Rhodes did not give the order that he had to wait until second shift to be seen, then there is clearly no deliberate indifference on Neves' part.  If these are the facts, then Neves had no involvement whatsoever in deciding that Hoffman should wait until second shift to be seen.  Hoffman does not allege that it was Neves who directed Carlson that he would have to wait until second shift.  Neves' involvement in his medical care ended when she told him to go back to his cell early that morning because of his refusal to leave his property in healthcare.  As stated in the August 2018 report and recommendation, a reasonable jury could conclude that if there was no conversation with Dr. Rhodes, then Carlson acted by herself when she said Hoffman would have to wait until second shift.  (ECF No. 38, PageID.289-90).  Accordingly, the dispute about whether there was a conversation with Dr. Rhodes that afternoon and whether Dr. Rhodes said Hoffman would have to wait is not material to the case against Neves and Neves was not deliberately indifferent to Hoffman's medical needs.

## IV.    RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that defendant Neves' motion for summary judgment (ECF No. 84) be **GRANTED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection

No. 2," etc.  If the Court determines that any objections are without merit, it may

rule without awaiting the response.

Date:  January 3, 2020                    s/Michael J. Hluchaniuk
                                          Michael J. Hluchaniuk
                                          United States Magistrate Judge

## CERTIFICATE OF SERVICE

I certify that on January 3, 2020, I electronically field the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to all counsel of record.

                                          s/Durene Worth
                                          Case Manager
                                          (810) 341-7881
                                          durene_worth@mied.uscourts.gov